I read last case this morning, number 2, 271, Sarah Littlefellow, et al., Davis Appellants v. Richard Carollo, M.D., et al., and its appellees. Arguing for the oppose, Mr. Terrence Marhont. Arguing for appellee Richard Carollo, M.D., Victoria Spring. Arguing for appellee Kennedy Thakar, M.D., Ms. Sydney Sineska. I make a motion. Good morning. Terrence Mahoney on behalf of the appellant, Sarah Wilhelm. Ms. Bader, also at counsel table, is my associate, Jennifer Mann. If I may begin, Justices. Thank you, sir. The, quite briefly, procedurally, this matter is before the Court based upon the entry of a summary judgment on behalf of and in favor of the defendants in February of 2011 by the trial judge, Judge Mullen. The basis in reason for the entry of the summary judgment was that a judicial finding that their plaintiff was unable to establish or create material issues of fact regarding proximate cause in this medical negligence cause of action. As heard by the trial judge, we, the plaintiff, asserted the proximate cause opinions that the injury occurred during the latter stages or recently before diagnosis of the tumor, which set forth in our brief, occurred in June of 1994. What's the standard of review in which we look at the evidence against the two general practitioners, or the two defendants, Dr.? Well, in the, for this Court, in the Frey analysis, it's de novo. And if we are, when we get to the trial judge's order of October of 2011, it's an abuse of discretion if, in fact, we isolate that her ruling was based upon a lack of foundation. So, getting, if I may, getting to that point, the summary judgment was entered because of a prior ruling by the trial court in a written decision that the court has as part of the record that the opinion of plaintiff's expert, Dr. Torzynski, she would be unable to utilize a period of time, 8 to 10 weeks, that this injury occurred 8 to 10 weeks before diagnosis. In her opinion, in pages 28 and 29, the court, who I have all the respect for, entered a ruling, this ruling, which we believe is factually erroneous because her ruling is based upon an interpretation of our expert's opinion that it was confined to a two-week period, 8 to 10 weeks, and therefore too narrow, and there was insufficient method or foundation to support that opinion, and secondly, that there were not two points or landmark of anatomic or pathological information upon which Dr. Torzynski had in order to formulate her opinion. So, getting to that point, and that's what this appeal is all about, if I may, is that order eliminated based upon a FRI motion which excluded the 8 to 10 week opinion. In the materials that we have presented to your honors, the 213F3 opinion, which was filed in this case, that was testified to by Dr. Torzynski during the FRI hearing stated, and is written and presented, part of the record in anticipation of what she would testify to at trial is this. We've supplied her with a lot of medical information concerning the pathology of the eye, the structures of the eye, and I won't get into that at all. Her opinion is that based upon the information in the pathology study that she performed, objective studies, that have not been contested and refuted by defendants' experts, not in their opinions nor during the FRI hearing, that based upon that data and based upon a photograph which has been submitted and proffered to this court, which was a part of the FRI hearing, that in November of 1993, that photograph of this infant demonstrated what is called a leukochoria, which is a mass which reflects when light is penetrated into the eye a white response rather than a healthy red response. For purposes of our argument, and I'm sure in the briefs that you have, none of the experts, my expert and the two defense experts, all agree that in November of 1993, that photograph demonstrated the condition of leukochoria, an object, a tumor covering the retina of this child's eye, that at that time we have a point, the initial point, that this tumor existed in her right eye to the extent that it was large enough to demonstrate the condition of leukochoria. Let me just stop you right here. There's no dispute of fact that the photograph demonstrates a tumor or a problem with respect to the eye. Yes, sir. Correct. Going forward from that point, based upon her pathological findings and data and based upon her experience, Dr. Torzynski expresses the opinion in this case relative to the time when this injury occurred, which is the extension of the tumor into and beyond the globe, into and on the optic nerve. One millimeter, just a few cells. Her opinion is that more probably true than not true, this occurred during the later stages of development approximately within eight to ten weeks prior to the date of diagnosis. Her opinion, therefore, plainly, is that it occurred during this two-week period. Her opinion is that, based upon the photograph taken in November of 93, if this child had been referred to a specialist, diagnosis made of what we know the retinoblastoma, the tumor existed at that time, based upon the photograph in November, that appropriate care and treatment would have included a nucleation of the eye, removal of the eye before, if that had occurred, before the first week of April. I'm having a problem with your statement that there's no dispute about the photograph going forward, evidencing the tumor in the eye, because there's plenty of testimony from other doctors and photographers that the picture is not reliable for purposes of determining whether or not there was a red reflex or wasn't a red reflex. And it seems to me to be a big question on that one issue, what part the photograph plays in the scenario. In answer to your question, Your Honor, the following. Now, the diagnosis of the leukocoria in this case, just looking at the photograph was made by Dr. Torczynski. That fact is a no. If we go forward to June of 94, we know that a very large retinoblastoma tumor was removed from this child's right eye. Going back to the November photograph, that deformity, that leukocoria, which is a symptom, primary and most primary and significant symptom, quite frankly, of the diagnosis for retinoblastoma. In her opinion, the tumor that was removed in June of 94 was demonstrated in that photograph of November of 93, seven months beforehand, based upon the use of photographs showing the condition of leukocoria in this particular case. The two experts for the defendants both testified that in this particular case, you can use photographs to become suspicious of the condition of retinoblastoma because of the presence of a white reflex. In this case, since this young child demonstrated that condition in November of 93, and they also agree with Dr. Torzynski, obviously, since we have a large Ellsworth Thigh B tumor removed from her right eye in June of 94, that photograph in November they agree with Dr. Torzynski in this case, that that photograph does in fact demonstrate leukocoria, which was in fact the formation of this retinoblastoma tumor. Let's assume that for a second. Yes, sir. How do we not know that at least one cancer cell hadn't crossed this lamina probosa, if I'm even pronouncing that correctly. You are, sir. On or before November of 93? The testimony of all the experts of Dr. Murphree and Bordenstein agree with Dr. Torzynski that this deals with the Fry analysis in the foundation. That is an in the latter stages of formation of a tumor, there's optic nerve invasion or involvement. That's in the record from the during the course of the testimony taken during the Fry hearing. Right. How do we not know, getting back to my question, how do we not know that on November of 93, this wasn't the latter stages of the tumor? This tumor was very well developed by when it was found in June of 94. June of 94. Yes, it was. And it got larger. The testimony of the experts, Your Honor, was also in agreement that over time, cancerous tumors grow. So it grew from November of 93 to June of 94. At the time it was enucleated. But we didn't have any testimony, Mr. Mahoney, as to how quickly this tumor grew or how quickly these tumors grew. The testimony that we have that's in the record, Your Honor, is the testimony from Dr. Torzynski, that based upon her pathological findings when she identified the neurovascular component of the eye and surrounding tissues, based upon the calcification and the necrosis of this particular eye, enucleated, indicated to her, also based upon the approximately 3 millimeter minimum size in November of 93 to June of 94, a large Ellsworth 5B tumor, that it was an indolent growing tumor, this particular tumor, this specific tumor. Her testimony did not relate it to any other tumors or any other cancer analysis. Her testimony is specifically to this tumor based upon her pathological findings and what we see in November in the photograph and know from accepted medical principles regarding the development of retinoblastomas and what was seen at the time of nucleation in June of 94. That based upon those known elements, are you going to know for sure? No. Did they have the test? Unfortunately, they don't, doctors don't use a protocol for the study of eye pathology and they don't look for extension of the tumor into the optic nerve in order to provide or initiate criteria for surgery. Obviously, it's a condition that is diagnosed most of the time, before that time, excuse me, and removed. So there aren't any studies, they don't look for boundaries or borders. They see it, they remove it, they enucleate it. In this particular case, we do have known agreed principles by all of the experts and that is that optic nerve involvement occurs during the latter stages and the latter stages, as defined in the testimony, is either death or enucleation. In this case, thank God, enucleation. And then the resulting radiation. And then the resulting radiation. Which is where, do you believe, the approximate cause of the damages is related? That's correct. The focus of the medical negligence case is not the fact that the eye was removed. It is arguable, but we did not take that position because it would be reasonable that at any point, if it had been diagnosed, if she had been referred to a specialist and observed, it would have been diagnosed and removed. It is the fact that it required a special protocol of oncology which caused destruction to her jaw and to her cheek, etc. Which is not specifically the subject of this appeal. But the timing of the extension is based upon getting to it again. I don't think it's a fry analysis because no one, none of the doctors were critical and the trial judge, we agree with 98% of her ruling in October of 2011. She found that in the testimony of Dr. Korzynski and the other experts there was no controversy concerning the method that she used. It was not a new and novel approach. Her pathology findings and data were done correctly. The other experts agreed to it. Her principles regarding the growth pattern of retinoblastoma tumors were agreed to also. Wasn't the rub with respect to the fry hearing concerning the photograph and the doctor's use of the photograph to make that her findings, basically? I didn't catch the reading. Wasn't the basis for Judge Mullen implementing the fry test, wasn't that based on or due to the doctor's testimony and heavily reliance upon that photograph? Yes. The initial inquiry, the initial filing by the defendants was they sought a fry hearing for the use of the photograph that that was a new and novel method. Then it expanded far beyond that once we got into the hearing. Wasn't that a new and novel method, something that the jurors may need some assistance with in explaining? The testimony at the fry hearing, and again, I'm pointing to the, because it is not contested, is the input of the defense experts. Their testimony was, and the wording of this changes, if you use a photograph to support a specific clinical diagnosis of retinoblastoma, that is unsupported by medical literature, and that is new and novel. If you use the photograph in order to determine whether or not there's an abnormality in the eye, in other words, you do not have a red reflex, you have a white reflex, that creates a suspicion that requires ophthalmological review and diagnosis. That is what Dr. Torzynski's testimony was, agreed to by the experts, and in this particular case, because of the size of the white response in that photograph, she determined, as the other experts did, that this was a leukocoria, and based upon what we know, from what occurred in June, we know it was a retinoblastoma. So the seminal inquiry was not that the photograph diagnosed it could be used as a protocol for the diagnosis of retinoblastoma, but that it was an abnormality that required more clinical workup from an expert, and probably is, in a suspicious form, that those are phrases used by all the experts in the prior hearing for a leukocoria. But she relied on the photograph, did she not to say that it basically, I guess, crossed over or got into the optic nerve, which would require removal and the radiation, or are you saying that she came to that conclusion other ways other than just the photograph? She came to the conclusions based upon a myriad of facts which she testified to, which included the pathological data and her understanding of the maturity of this particular tumor based upon, again, the neovascular calcification and necrosis that were apparent, number one. Number two, we know how large it was in June, point of fact. We know that minimally it was this large in November of 93, point of fact, which all the experts agreed to. Using that information, that clinical information that is agreed to is literally uncontested, applying other principles such as tumors grow in bulk, that during the latter stages of the development there's optic nerve involvement, and there were two other considerations, principles that the other experts agreed to also concerning the development of tumors, and upon all of those the data that she had, the two points that she rendered an opinion that as of the first week of April, it's not during a two-week period, it's that this event occurred within an eight to ten-week period prior to diagnosis. It is not a narrow two-week, it is based upon all the information that we have, and I would respectfully suggest that based upon the record, in terms of the foundation, there is no other input, there is no other practical data that could be accumulated for the testimony of the two defendants' experts that could be used as another step or additional platform for Dr. Torzynski's foundation. And ultimately it is pure opinion, pure opinion, based upon pathology, based upon two points, and it's not a two-week period of time, in all due respect to the trial court. Did Sarah ever make any complaints to the medical doctors before the last visit? During the course of her care and treatment with Dr. Ferrello, which is the first 11 months, there was an entry of a pupil asymmetry in July, there was an entry of an iris discoloration, and mother made several complaints to him about the eye turning out, turning in, the condition of strabismus. Also, our indicators... Pardon me? Isn't that a disputed fact, whether the mother told the doctor about the eye turning out? The asymmetry... He, at one point, believed that he... I believe that he charted that entry. There were other multiple complaints that the mother made that are not part of the record. So there were complaints during by the mound, and there were... there was objective data that was entered in the medical records during the first 11 months, up to December of 93. And is there any testimony, doctor, that the two defendant doctors breached the duty of care? Yes, yes, which is not a part of... Yes, we have testimony from a family physician, and the defendants are family physicians at great length of the multiple deviations from the standard of care. So therefore, Dr. Torzynski's expert role in this matter was to address when, approximately, this injury occurred. All right. Thank you. Your time is up. Thank you very much. Ms. Springer, I'm going to let you get situated, and I'm going to ask you a question. Why is it that you don't believe that Judge Mullen was wrong in applying the Frey test here? I mean, isn't it clear, in some respects, that this doctor gave her opinion based upon a reasonable degree of medical and scientific testimony? The answer to that is in two parts. First of all, I do believe that the testimony was... I also believe it doesn't really matter to the ultimate conclusion because I think the testimony was also correctly barred for lack of foundation. I think Frey is just one particular type of foundation, which shows that there is a scientific basis for the methodology used. That's one type of foundation. Judge Mullen found that the methodology was not unique and that the methodology did support the conclusion. We disagree, but Judge Mullen then found that there was not any factual basis to support the opinion. Illinois law says you can't have a pure opinion, as the plaintiff argues, out in a vacuum. An opinion is only as good as the facts upon which it is based. And in this case, Dr. Torzynski's opinion is really not based upon any facts. She has no testimony as to how long it takes neovascularization to occur, how long it takes calcification to occur, how long necrosis takes, how quickly these tumors grow, what size it was in November of 1993, at what stage in a tumor's growth does it cross into the optic nerve. She has no facts to support those conclusions. She's got no research. She's got no experience. She's got no background. She testified she's never done this before. She's only diagnosed one retinoblastoma case before early in her career. She's never taught regarding timing the crossing of the retinoblastoma. She's never read any. She's never not relying on any literature. She has no background, basis, foundation for doing it. How do you respond to the plaintiff's argument that Dr. Torzynski had a starting point and an ending point, and that starting point and ending point gave him a factual foundation to support an opinion regarding the growth and removal of the tumor? I had two responses to that. First of all, we don't in fact know the size of the tumor. All we know is that at least a portion of the tumor was directly behind the pupil so that when light went into the pupil it bounced off the tumor instead of off the retina. We don't know how big the tumor was at that size. How do you get around the doctor's opinion that the tumor's growth accelerated during the last part before it was finally diagnosed and at that time the growth factor was a significant growth factor? Because there's no basis for Dr. Torzynski to say that. All she's doing is looking at the pathology slides after the eye was taken out. Seven treating physicians testified, including the physician who removed the eye. They are all ophthalmology specialists. They all said that the tumor growth rate of retinoblastoma is extremely unpredictable. The rate is unpredictable. The behavior is unpredictable. Dr. Murphy, who has spent his whole career trying to understand these over 30 years and is associated in this committee with 40 institutions which are trying to answer this exact question, are unable to determine when the tumor cells cross the lamina curvosa. And that's something they would like to be able to do in order to treat the patients that they have. Dr. Torzynski has no basis for that opinion. It is her pure opinion and she's using backwards extrapolation, just like Dr. Shapira did in Agnew. And there is no scientific basis for doing that, for saying, I know what the tumor will look like over here and therefore I can figure out what it will look like over here. Well, can't you make a reasonable inference based upon medical knowledge that a tumor is going to grow? It's not going to get smaller from the time that November of 93 to June of 94 that it would have gotten bigger. In fact, and there are cases on this, we don't know that cancers always grow. They don't always grow. Sometimes they stop for a while and then they grow. We have testimony from Dr. Weiss, who's the physician who took out the eye. He said he has seen tumors that cross lamina curvosa in utero. There was testimony in the record that it could have crossed lamina curvosa earlier and then not gone any further and grown in a different direction. So, in fact, we don't know what Dr. Thorzinski says she knows. Did anybody specifically say that it could have crossed this line on or before the photograph was taken? There is no other testimony about when it could have crossed the line. There's no way. It's not as if there's a question of fact. You always ask the hypothetical. That's what I'm asking. Could it have crossed the line by November of 93? Yes, of course it could have. I know you're arguing that. Is there anything in the record that says that? There is no other testimony that says it could have. I think it crossed it this time. The testimony is these tumors behave extremely unpredictably. Dr. Weiss has seen them cross before in utero. There's testimony that he has seen other tumors cross and then stop. Dr. Murphy has said that he has seen tumors that he was ready to inoculate but then couldn't do it for some other reason and waited several months and there wasn't a significant change. So these are very unpredictable and therefore it could have crossed at some earlier time. But there is not to directly answer your question, there is not somebody who testified in the record it could have crossed earlier. So I think whether we look at Agnew or whether we look at Fry or whether we look at straight scientific foundation, there is no foundation for her backwards opinion. And without that opinion that it crossed 8-10 weeks after diagnosis, summary judgment was warranted because the plaintiffs do not have proximate cause evidence. The trial court did seem to limit it to this two week period in this ruling, correct? Did the trial court misconstrued that evidence? I do not think that the trial court misconstrued that evidence and I quoted in brief several places where Dr. Korzynski talked about the two week period inter-deposition and inter-Fry testimony and where the plaintiff's attorney talked about the two week period. But there isn't any more support for a broader period. There isn't any more support for a two and a half month period. There isn't any scientific evidence to establish when this crossed, whether we're talking about two weeks or two and a half months. And that's the plaintiff's verdict. They have to prove proximate cause. They have to prove that at some date if the tumor had been diagnosed before that date, she wouldn't have needed radiation because that's the damages that they're seeking. They're only seeking damages for approximately causing her to need radiation. So that's their burden and they have to prove it. And they have not. And that's why the trial court correctly granted summary judgment. So even if you find that Dr. Ferolo violated the standard of care in not referring to an ophthalmologist sooner, you still may not have the proximate cause. Yes, that's true. Because if by the time Dr. Ferolo should have referred the child to an ophthalmologist, the cells had already crossed and there wasn't some earlier time that someone says he should have referred her if that's the time he should have referred her and that's when the cells had already crossed there's no proximate cause for the damages that the plaintiffs are seeking. And it is not factually accurate and there's no support in the record as the plaintiff argued that these are usually discovered before they cross. There's no evidence to that point. And the they're not usually diagnosed before they cross. If you have no further questions for me, I'd like to give Ms. Nisga'a an opportunity. You have, I believe, ten minutes, I think. Yes. What's the time? We've got one more minute. Oh, all right. I was looking at the clock and thinking what did I do to my time? I think that, I just think that the term ladder stages, which is what the plaintiff is trying to do, expand the term ladder stages to mean, well, we know what ladder stages means. We don't know what ladder stages means. Dr. Dorzinski said she would be speculating to say that the tumor in, that she believed existed in November of 93 was in its ladder stages or not. She doesn't know. And as to her methodology for using the photograph, Dr. Dorzinski said she could not arrive at this opinion without the photograph. And there is no scientific support. Nobody else uses photographs. In fact, nobody else is able to tie the crossing at all. Certainly nobody else uses photographs to do it. But didn't Dr. Weiss and some of your experts say that the photograph was suggestive but not diagnostic? Yes. Didn't she use the photo as suggestive and not diagnostic? In retrospect, the doctors have said, yes, now that I know that the child had retinoblastoma, I think this photograph probably suggests it. But nobody says it's diagnostic. Did she say it was diagnostic? Dr. Dorzinski said without that photograph and knowing what size it is based on that photograph, I wouldn't be able to come to the conclusion I came to now. So yes, I think she's using it as more diagnostic than anybody else does. Dr. Murphy says all you can tell is, in retrospect, now that we know there was a tumor, probably there was a tumor then. Not any more than that. Didn't he say 3 millimeters? He said it would probably be about 3 millimeters in order to block the light. Didn't she rely on that? I don't think she relied on Dr. Murphy's opinion because she arrived at her opinion long before Dr. Murphy disclosed his opinions or testified. She came to her opinion when she was disclosed. In fact, she had her opinion when she was disclosed as a treating pathologist, which she wasn't exactly, before she was ever disclosed as a 213 expert. She said it was across in the latter stages and based on the photograph. Thank you. Good morning. Stacey Sonesco for Dr. Thacker. As indicated in our brief, Dr. Thacker's involvement or questionable involvement is specified on two dates, that being February 21st and February 24th. If it crossed prior to then, Dr. Thacker is not liable. And if it crossed between those two dates, he would only or she would only be liable for the one visit. And that's important because without pinpointing when the tumor crossed with some certainty, it's difficult for the physicians to defend which treatment they rendered at which point in time. In this case, we don't know the stage of the tumor in November of 1993 at the time of that photograph. While we have a general premise that it was at least three to four millimeters big, it could have been bigger than that, and we don't know when it began. Dr. Terchinsky herself admits she has no idea and she would be speculating without knowing what stage the tumor was in at the time the photograph was taken. It truly is impossible to say what the later stages of development are. There was seven months after the photograph until diagnosis. The child was 18 months old, I believe. That certainly could be later stages, meaning November of 1993 it could have passed. It could have passed in December of 1993. It could have passed in utero. The point being that it would be speculative for anyone to render an opinion in that regard. I think Judge Mullen was correct in applying Fry and barring the specificity relative to the opinion. Whether it's eight to ten weeks interpreted as a two-week time frame or whether the eight to ten week is interpreted as two and a half months, you can't pinpoint it with any certainty. Certainly it crossed over before the referral, correct? We know that it went in time it passed. Nobody knows for certain. That's the point. How about prior to the referral? The referral to the diagnosis was based on a referral, correct? The diagnosis, right. The child was referred, correct. Eventually referred. Right. So the time that there was a referral, so between the time of the referral and the removal, can't you make a reasonable inference that it had crossed over at the time of the referral? No, I don't think that you can. I don't think that anyone has offered an opinion in that regard. The reason being that there's nothing that would tell you that. There was no way of examining the eye and the detail that would be necessary prior to its removal. So nobody knows when it passed, whether it was the day before it was removed, whether it was in utero, and that's the problem here. The physicians would then be unable to ascertain what treatment they're required to defend. What's important relative to Frye is that it is far-reaching, the Court's determination here is far-reaching because you can look to other jurisdictions, you can look to what other physicians have held in determining what the general consensus is and what's generally accepted to determine that this physician, based on very generic information relative to the pathological findings, and then a photograph can pinpoint when this very significant event occurred, when there's nobody else in the scientific community that can do so, I think has far-reaching implications. The other aspect of Judge Mullen's ruling was the foundation, and as my counsel for Dr. Ferolo spoke about... Did you rely on the Nopes case for your rationale regarding foundation? Did... No, I'm familiar with the case. The Nopes case, if I recall... I think his question was did Judge Mullen rely on that case in reaching her decision. I think that she did refer to that. The issue in the Nopes case, though, was the carpal tunnel, and the treating physicians in that case used not only their experience and training, but also their differential diagnosis for this patient in particular, and the history and treatment and so forth in arriving at the opinion that the plaintiff had carpal tunnel related to his employment. There had certainly been a number of studies that were done. It was well accepted in the community that repetitive motions can lead to carpal tunnel. There was certainly enough foundation in that case for the physician's testimony. There isn't any foundation in this case. That's the very point, is that she doesn't have any education or training. She hasn't taught on it. She hasn't done any research on it. She has had no clinical experience with the patients to speak of, and she's only diagnosed it on one of two occasions herself. So I think to that extent it's distinguishable from Nopes in terms of whether it's a pure opinion. She ultimately relied on the Fry case. I mean, she referred to Nopes, but she ultimately relied on Fry in reaching her decision, did she not? I think it was a two-prong analysis. She relied on Fry. I think she found the more persuasive argument to be foundation. I believe that she held either way, that the testimony was insufficient and that summary judgment was appropriate. So you don't believe that any testimony from the plaintiff's doctor could be an issue for the trial of fact? I don't. I don't because I think that it requires the trial of fact to reach a conclusion based on speculation. They would have to determine what the later stages of development is and what recently is when no one else in the scientific community can do so. And the problem in part is relative to at least Dr. Thacker, is that they're talking months, they say. It had been a while. Well, that puts it right when Dr. Thacker was treating the patient, was months prior to this. It would be pure speculation for a jury to pinpoint a specific date. When none of the scientists can do so. Thank you. Counsel, maybe you could start off by responding to counsel's comment regarding, we have this general principle that this line is crossed in the later stages of a tumor's development. How does that equal eight to ten weeks before diagnosis in this case? It equals based upon several other items that were recognized by Dr. Torzynski and agreed to by the other experts, and that is the fact that this tumor, based upon all of the data that was acquired and reviewed after the June 28th nucleation, it was a very large tumor with one or two cells escaping the globe. There was a one millimeter extension from the globe onto the optic nerve. So we have microscopic deposit extension from the globe, from the tumor growing out of the globe over a long period of time and emptying then into the optic nerve. Number two, we have the PATH results indicating to Dr. Torzynski that this tumor was aged in that the degree of calcification, neurovascular structures, and necrosis showed blood supplies dying and reappearing and dying again is a pathological indication, which was quite mature in terms of time and growth. In this particular case, in this specific case, all the experts agree that this tumor grew over time, did not become dormant, and did not get smaller. Dr. Murphy and Barenstein. Lastly, that, which I said previously, Mr. Justice, they all agree that the optic nerve involvement occurs during the latter stages of development, and the latter stages of development is when it's enucleated or done an autopsy when the patient has died. In this case, we have microscopic extension. We have no evidence of metastasis in any other regions of her brain, which is indicative that the metastasis onto the optic nerve was an event that occurred recently before diagnosis and enucleation because there was no additional growth or metastasis to any other portion of the optic nerve or into the brain. And that is a very important, significant piece of medical and clinical information that the defendant's experts agreed to. There was no metastasis. And to the Justice's point regarding how often does this happen, we know in this particular case and not looking at other cases, that there was no protocol in the state of Illinois, at the University of Chicago or UIC to treat optic nerve retinoblastoma extension. They had no criteria or protocol to treat it because as a cancer center and as a center for ophthalmological abnormalities and complex problems, they've never had that situation. The testimony in this case by the oncologist, she contacted other oncologists throughout the country seeking a protocol. How do you treat a 14-month-old infant with retinoblastoma optic nerve extension? And she testified in this case that she was told we've never had that problem. We don't know. You're going to have to create your own dynamic, excuse me, criteria for the protocol and attempt to aim the radiation at points, hopefully not to cause a brain defect. That's how often it happens. It doesn't happen. Based upon the testimony in this case, addressing one question that was asked, Dr. Murphy testified in this case that this extension beyond the optic nerve, into the optic nerve to this degree, minimal degree, could have happened the day before the enucleation. It could have happened that recently. So Dr. Korzynski's opinion, reasonably, that it occurred 8 to 10 weeks before that time is a very reasonable inference based upon all the data that is available, not something that she made up. My last comment is this regarding the cases interpreting the exercise of extrapolation, which the courts rightfully should not allow because it would appear to be an expert arriving at an opinion and then trying to justify that opinion based upon either other cancers, other circumstances or situations, or merely stating it had to have happened at this time. That did not happen in this case. The basis and the foundation of Dr. Korzynski's opinion was cumulative based upon all the information that we've discussed. Thank you for your attention.